Senator Mike Brammer Spent nuclear fuel. We've heard that before. Yes, Your Honor. May it please the Court. There's only one issue in this case, and it pertains to overhead in spent nuclear fuel cases. And it's the same issue as in other cases, right? I heard, and I think maybe you argued it, there was a case last month that raised the same issue, wasn't it? Well, in fact, I was going to catalog the three. In fact, my colleague, Mr. Lester, argued one of them. The three cases that were argued in February that contained the overhead issue were Energy Northwest, System Fuels Arkansas, which I believe Mr. Lester argued, and System Fuels Mississippi. So there are three different cases that contain overhead. Same issue as this? There's a legal issue. This is a purely legal issue. In that regard, the issue is slightly distinct, but many of the same underlying themes are being pursued. I should also point out that just yesterday, in order to comply with the representation that Mr. Lester made before Chief Judge Rader, we submitted a letter to the Court reflecting the common issues in each of the spent nuclear appeals that are currently pending. And overheads, as the Court has noted, is one of the cases in which . . . We don't dispute, Your Honor, that as a matter of generally accepted accounting principles, that the allocation of the costs complied with GAAP . . . So the only issue in this case is the fundamental legal question as to whether they're entitled to overhead. You're entitled to overhead. Yes, Your Honor, but it's a little bit more refined than that because I think it's a disagreement about what this Court's holding in Carolina Power says. And in Carolina Power, well, as the plaintiffs would have it, and here I'm quoting from page 17 of their brief, plaintiffs contend that under Carolina Power, fixed overhead costs are recoverable as damages, quote, as long as they are properly allocated in the normal course of business. Now, we don't agree with Southern California Edison that that's all that Carolina Power requires. Fixed overheads may indeed be recoverable in some circumstances, and we agree that proper allocation is a necessary but not sufficient condition to establish entitlement to their recovery. Under Carolina Power, the touchstone is not just proper allocation, but also a showing that resources from the pools that comprise the overheads were diverted toward the breach-related projects. And that's precisely the finding that the Court made in Carolina Power . . . Because there's a chief executive of the company and his salary goes into overhead, and he works on the breach issue as well as other things in the company. Do you contend that under those circumstances that that portion of the overhead shouldn't be allocated to the breach costs? We would not disagree, Your Honor, if there is a showing of a nexus between that CEO's work and the breach-related project. And we're not necessarily suggesting that it has to be the exact allocation that's provided as part of their allocation of overheads pursuant to GAAP. So what you're saying . . . what you're addressing yourself to is the notion that there might be an item of overhead, let's say the salary of a lifeguard at a beach, which has nothing to do with the breach, and that you shouldn't bear that part of that cost. That's precisely our argument, Your Honor. And in fact, in this case, there were approximately a dozen just examples, adduced at trial, on which Southern California Edison did not dispute that the underlying costs included within the overhead pools had absolutely nothing to do with the projects for which they were claiming damages. Nothing to do directly with the construction or maintenance of that project. Nothing to do directly, nothing to do indirectly. Let me pursue the question one step further. Let's assume that instead of running the ISFSI as a project within the overall program of Southern California, let's assume they created a corporate subsidiary, which they called the Mitigation Corporation. And then they staffed that with presidents, vice presidents, accountants, cooks, perhaps even a lifeguard, so that the employees, you know, didn't die dealing with this stuff, or at least they died out at the beach, not in everybody's sight. Would you be making the argument that the overhead for that separate subsidiary, which did nothing other than deal with the spent nuclear fuel, would you be making the argument that that overhead, presumably properly allocated, was not acceptable? They couldn't get it? I don't think we would, Your Honor, provided that... You say you would not be making that argument. If I can... They would be entitled to the lifeguard. Well, I think that falls within the scope of my proviso, which is that provided that there is a nexus between the costs that are included in the overhead pools and the overall function of that Mitigation Corporation, I would certainly question... Well, let's assume the Mitigation Corporation has to do everything that a reasonable corporation would do to maintain its employees, pay pensions. They don't have to treat them as public employees, but they have to pay pensions and everything else. All that would be included. I think we would agree with that. Yes, Your Honor. To the extent, however, that there are, as the Court seemed to carve out, unreasonable expenses, expenses that have nothing to do with the underlying function of the Mitigation Corporation, then no, those costs should not be included in the claim against the government. But that's sort of not the way that overhead is usually allocated. You put all sorts of costs associated, I guess, according to revenues or costs. I don't know which circumstance here. But, you know, there's no inquiry into whether a particular item that's in the overhead pool benefits a particular project. It's all just lumped together, I guess, on the theory that it's just impossible to separate it and that you have to come up with a rough allocation based on costs or revenues or whatever, right? I think that's the theory, Your Honor. But in practice, I'm not so sure that it's impossible to segregate it. And if the Court considers what's actually in the appendix and the individual cost breakdown, we're able to get a pretty good idea of what is in the overhead pools. And it's from that list, and this list that I'm referring to is on page 1454, it begins with all the costs that are in the largest of the overhead pools, which is the common allocation pool. And just going through those costs, we can see dozens of different examples of expenditures that the government, as a result of this case, is winding up subsidizing. The government is paying for the cost of emergency planning requirements that Southern California Edison has to go through by plaintiffs on admission. It has nothing to do with dry storage. There is no emergency planning that has to be related to that? There's no independent emergency plan that has to do with the dry storage facility. If I may give another example, because we can certainly go through them all and questions could be raised, but of course they were never addressed by the trial court about this. But there are certainly things that on their face vary. You want the trial court to go through them one at a time? Is that what you're arguing? We're certainly suggesting that it's appropriate for the plaintiffs in formulating a claim and for the trial court, to the extent the government can test the claim, to go through expenditures that are identified that on their face have nothing to do with the government's bridge. Another one I'll mention is a so-called fish impingement study. Southern California Edison is required by law to examine the extent to which when it draws in water from the Pacific Ocean in order to cool the spent fuel in its reactor, it's required to ascertain how many fish it's killing. Well, that requirement by plaintiff's own admission in this case has nothing to do with the government's failure to pick up spent nuclear fuel from the Song's facility. Nonetheless, the government is... Under GAAP, if I recall correctly, that if there's an item which is associated solely with a particular activity, that would normally be treated as a direct cost of that activity and not put into overhead, right? Isn't it? That's, I believe, the first test. And I gather when we're talking about under GAAP, we're talking about the cost accounting standards that are incorporated into the bar. There are other avenues toward inclusion of indirect costs into an overhead pool. But in all of those... But I thought, is my statement correct that if a particular activity is associated with only one project, it shouldn't go into the overall overhead pool. It should go as a direct cost of the project, no? That's typically the way things are accounted for. Well, right. Which seems to me that's really what you're saying, is that there are things in this overhead pool that ought to be associated as direct costs with other projects rather than to put in the overhead pool, no? I don't think that's quite right, Your Honor. And the CEO... Well, let me not even take the CEO. Let me take the example of the company's help desk, where they field telephone calls concerning computers that won't run, things like that. It may be Southern California Edison's practice, and frankly, a lot of organizations' practice, not to direct charge the time spent for each user who calls up the help desk and charge it to that user's department, and rather just to bill that, the overall cost of the help desk collectively, and then to put it into an overhead pool. To the extent that there's evidence in the record that people who worked on the dry storage facility used this help desk, then I think it's appropriate to include it within an overhead claim. But to the extent there's no evidence about that, then it shouldn't be charged against the government. Well, isn't that a cost of doing... Coming back to Judge Dyke's question, that highlights the fundamental difference between direct costs and overhead costs. There's an area of this that I'm somewhat familiar with, which is the government's funding of university research programs, and we always put in a significant factor for overhead, but the overhead was never directly tied to the particular research project. It was the cost of doing business to run a major university. They have a problem. They are running a major nuclear power system and nuclear power plant, and the government isn't doing what it promised to do, which is to get rid of that spent fuel. Now, admittedly, the car that the president of the organization has at his command may or may not be, or her command, may or may not be directly attributable to the spent nuclear fuel because maybe he never goes to the plant or that part of the plant. But still, isn't that an overhead cost? Your Honor, it is an overhead cost. And it is a cost that is legitimately claimed when you're dealing with a breach of contract that deals with any other part of the operation. Not necessarily, Your Honor. I know not necessarily, but still, you're asking for itemization of virtually direct costs. You want to know that somebody in the SNF actually called up the help desk and said, can you help me? Our bathroom's clogged up. Really? Does that make sense to you? Absolutely, Your Honor. And I know I'm into my rebuttal time, but I think this is an important point. It's not asking a lot to have, when the government questions a particular cost within an overhead pool, to simply have the plaintiff say, yes, there was someone who worked on the dry storage facility who called the help desk. There are tens of millions of dollars worth of costs that the government identified during the trial for which no such showing was made, and about which the plaintiffs don't contest that they had absolutely no nexus to the dry storage facility. And that's precisely what this court held in a case that Judge Lurie authored called tech knowledge, when it was describing the cost discounting standards and required at least some nexus to a government contract in order to make a showing that costs included in overhead were properly allocated to an underlying damages claim. As you noted, you're well into your rebuttal time. Do you want to say the rest? I would like to, Your Honor. Thank you. Mr. Fagg. Thank you, Your Honor. May it please the court. There are three propositions that control and require affirmance of this case, at least. One, there is no meaningful distinction between this case and the Carolina Power case by this discretion to the trial judge. Clear error standard, application of that standard here respectfully requires affirmance. And thirdly, the rule and the result in this case, a proper allocation of overheads or recoverable, is sensible. It makes practical sense. It's good sense as a policy matter. And the government's position- Well, you wouldn't dispute, would you? Let's suppose that you had put into an item of overhead the salary of the plant manager for one of the nuclear plants. And his only job was managing the plant. And if they said, well, that really doesn't belong in overhead, that ought to be treated as a direct cost of the operation of the power plant, you wouldn't dispute that they could argue that that should come out of the overhead pool. That circumstance, emphatically, is not here. But the answer is, to your question, is yes. If it's a direct charge, typically, from your Honor's prior questions, direct charges are charged directly, the claim would be more. But what the- You prefer it that way because you'd get 100% instead of- Exactly, Your Honor, exactly. But it's important to look at the record in this case, the substantial record. And we keep hearing about fishing. That seems to me that the difference between you is that there are overhead costs which represent some things which are not necessarily company-wide, but they affect the number of projects. So they go into overhead. And just for convenience, you're charging that to other projects even though some of the projects may not benefit from that. And you say that in general is the way overhead is done and there shouldn't be a departure from that. Well, the first part of that, I might take a bit of an issue with, Your Honor, is just for convenience. I mean, as Your Honor said, there's gap, there's FERC, there's stipulations in this case. The stipulation where these costs were related to, I quote, related to the ISFCCI. The party stipulated that, okay? So the notion that this fishing hingement, you know, had nothing to do with the ISFCCI. Mr. Riley, the vice president of the company, testified at pages 209 to 212 of the transcript in our appendix at 1053 about why those costs were appropriate here. They're part of the Part 50 NRC license. This ISFCCI was constructed as part and parcel of that NRC license. These fishing hingement studies are necessary to have the license. If you don't have the license, you don't have the permit. But that sort of seems to be a kind of a different defense. In other words, what you're saying is these costs did, in fact, benefit the mitigation efforts. Well, the, the, the... I guess I was wondering, there seems to be a claim that some of these things in the overhead pool had nothing to do with the, with the mitigation efforts. And you seem to be saying, no, no, everything did have to do with that. Well, let me try to... In other words, the question is, is it a fact issue here, or is there a basic legal question as to whether you can include in the overhead pool and charge it to the mitigation efforts if a particular item had nothing to do with the mitigation efforts? Well, if there were, if there were a question about the allocation of the overheads, that would be a different question. But as, as we've, as the record is clear, as the trial judge found, that's not the situation. They were properly allocated and properly charged to the project. Now, the, the, I think where we are, are having some issues in our discussions here is the government is saying nexus, what they really mean are direct charge. It has to be direct charge. If it's not the call to the help desk, if it's not the sort of direct charge that, that they want, that by definition is why you have overhead pools, because those relationships don't exist. This is a, an important case. There's an important issue, I think, in this case. It's going to have a bearing on a lot of other cases. So help me be sure I understand. I, I really meant to have a chance to ask Mr. Aberbacke, and perhaps I will on rebuttal, to clarify exactly what the government's position is. If I, you've just suggested that what the government wants is to reimburse only direct costs, virtually no overhead, unless that overhead can be directly shown to be attributable to the SNF, right? That's your... That's our understanding of their position. That's what they're asking for in this case. They want every, almost $43 million of those overheads. That's a fundamental legal issue that needs to be resolved, because I don't hear the government saying the trial court should have gone through... Look, there are three kinds of categories of overhead. There's, there's common allocation, the corporate administrative, and something called internal market mechanism. I'm not sure which of those three they're challenging, but I think they're challenging all three. Is that your understanding? I understand that, and, and with respect, Your Honor, this court has already answered and resolved that question at Carolina Power. Well, that's not entirely clear. Well, let me, let me, if I could, address that a little bit, because we did... I don't understand that to be their position. I thought they were saying that general corporate overhead salaries of executives and things like that, which would have some relationship with the mitigation efforts, were properly charged. What they're saying is that there are some items of overhead that did benefit the mitigation efforts, and those shouldn't be charged. Well, I think the second part that you, I think given Carolina Power, they don't, they can't just say overheads shouldn't be charged, but look at what they're asking for in this case. All right, that wouldn't be, that wouldn't be a tolerable argument. But that's the, that's, that's what they're asking for. Counsel, let me quote to you from the government's brief. For all of these reasons, SCE's overhead costs are not recoverable. Overhead costs are not recoverable. That's what the government said. That's the point, that's the point I'm trying to make. There, there's a, there's a sheep in wolf's clothing here. If they mean that overhead costs are not recoverable, then that includes corporate administrative, it includes common allocation, and it includes overhead costs. That's what I understand. That is what I read the government as asking for in this petition. Now, we'll get a chance to clarify that with the government in just a minute, I'm sure. And I'll predict what Mr. Abback will say. He'll say, no, we're not taking it that far, because that's a loser. And that, again, that has been resolved by this court in Carolina Power. What Mr. Abback will say is, no, but it's incumbent upon the plaintiff who bears the burden to go through and show that fish impingement affected the SFC, that the environmental regs affected the SFC. Well, what are we doing then? Then we're taking direct— What's wrong with that? What's wrong with that is, as the trial judge found in this case, after extensive testimony and evidence, he found that it was not practical to do that. And that's why we have overhead pools in the first place. If it's possible, Mr. Morales' testimony, if it's possible to direct charge it, that's the preference. That's a better way to do it, because there's more responsibility. That's really the allocation issue. Which is stipulated to do in this case. Well, that's what I understood. It is allocated property. That's why I asked Mr. Abback right at the beginning of the discussion, is allocation at issue in this case? And he said, no. And it can't be, given the trial record in this case, and given the evidence that was before the trial court, and both the testimonial, documentary, and stipulations before the trial court. Is there such a thing as an overhead pool which is allocated only to specific projects and not to all projects? Is there such a thing? It's not in this case, Your Honor. Well, let me be clear. Just as a matter of accounting. I mean, is it done that way sometimes, that you have overhead pools that are limited to, you know, half the company's business, but not to the other half? There's as many different allocations almost as there are companies. But it's usually the case that the pool is allocated either on a cost or a labor basis. There's some determination made as to fair and equitable. That's the gap in the FERC standards. It has to be an equitable basis to allocate the cost if they can't be direct charged. And I think Your Honor's prior questions did accurately capture the reason why there are overhead pools. And so whether it's allocated on a cost basis or a labor basis, there is an informed determination made as to how to allocate those. And so in this case, we have the common allocations, which are the site-specific. We have the home office. Edison does more than just the nuclear plant. And then we have the internal market mechanism costs. But they're all allocated according to procedures that are not challenged here. And we're never challenged. They could have been, but we're not. Just a couple of words, if I could, about the standard of review. Again, Carolina Powers stated it very clearly. Clear error, wide discretion. As the court is aware, there's two cases pending right now, at least two. Three, I guess, involving overheads. The system fuels cases, of which one of them argued on February 8th, just like you were on that panel. In those cases, the trial judge is in the main awarded overheads, as the trial judge did here. But there were small, I'll call them quirky, overheads that were denied. Those utilities challenged that denial. And Mr. Averbach's colleagues stood up here and said deference. This is a clear error. Said what? Said deference. Deference to the trial court. Clear error. Finding of fact. And now here, they lost, and it's a question of law. And my only point here is— No, but the question is whether they're quarreling about specific items, for which we give deference, or whether they're quarreling about no overhead, which is a basic legal proposition. No deference there. Well, the no overhead rule, again, has been resolved, which was submitted by Carolina Power. And if they're quarreling about specific items, that's not what their briefs say. That's not what the trial record— they can't do that having stipulated to the proper allocation that related to all of the trial record in this case. So my point is, this is a result-driven approach here. When it's a loss, it is— Every litigant. Well, fair enough. Fair enough. Fair enough. But to the extent that there's a notion that there's some overarching principle here, I think that's important for the court to understand. And again, getting to the result here, as the trial court held, the incentives of the rule that the trial court applied in this case are the right incentives. If you have to go hire outside contractors, create a subsidiary, cost damages are going to go up. That's not why companies operate the way they do with their overhead pools. Recovery of overheads is routine in most contexts. So the Capital Sand case we cited, Eighth Circuit case, the government itself went and recovered overheads. Not because a statute said you can go recover overheads. All that statute did was codify what this court said in Indiana, Michigan. Full cost recovery. And the government there, on a $280,000 claim, recovered $98,000 in overheads. And the issues there were causation. All the same arguments we're talking about here today. And there wasn't any sort of going through and line item, you know, looking at what was in the overhead pool. It's routine. It's good enough for the government. It ought to be good enough for private parties. The magnitude, I would note parenthetically there, is far greater than the magnitude of overheads here. There are some suggestions in the briefs that the magnitudes create some question here. And then finally, there's no basis to limit the government's arguments here to spent nuclear fuel cases or other cases. You know, the government, again, it's a wolf in sheep's clothing. The nexus argument they're making is really an argument for direct charges and for no overhead cost at all. If the plaintiff in a spent nuclear fuel case has to go through and show a direct charge for every line item in an overhead pool, then the construction company's copy machine is vulnerable. You know, that copy machine existed before. There's no aspect of an overhead pool that can be claimed under the normal overhead principles that have been applied for decades, if not centuries, by this court and other courts. And so again, I think I have a couple of minutes left. I want to go back to the Carolina Power case, because we threw the gauntlet down in our brief. We said, this case is Carolina Power. And the government had a chance to make the final say, had the last word on this. And I think it's important to look at what they said about why this case is not Carolina Power. They said at page 3, and I'll quote, the trial court specifically found that SEC would have incurred the claim overhead cost in the normal operation of the song site, irrespective of the breach, close quote. Let's look at what Carolina Power said. The trial judge in Carolina Power said at 82, Fed Claim 48, and I quote again, most of Progress Energy's overhead expenses are fixed, meaning they do not change with the volume of business, end quote. There's no distinction there. There's no difference there. Overhead pools have in them some fixed costs. And that was true in Carolina Power. It's true here. It's true in every case where there's overheads. Now, parenthetically again, they're not all fixed. As a trial judge noted here, the volume of activity does shrink and contract the size of the pools, but it's not a one-for-one correlation. Again, that's why there are overhead pools. Again, distinctions for Carolina Power. Tell us what the distinctions are. The government says at page 11 of their brief, I quote, the witness had conducted no analysis to determine whether the costs were affected by the breach, close quote. Trial court in Carolina Power, affirmed by this court, said at 82, Fed Claim 48, quote, Progress Energy did not quantify the amount, if any, by which its overhead costs increased as a result of the breach-related projects, close quote. Again, there's no distinction between Carolina Power. In this case, no material distinction. The government made the same arguments in Carolina Power that it made here. This court rejected. With all due respect to those arguments, there's no basis for a different result. So no further questions. Thank you. Thank you, Mr. Fagg. Mr. Averbeck has a couple of minutes. Mr. Averbeck, do you have your brief? I do, Your Honor. Let's look at it. Page 20 of your brief. You say, this court's ruling in Yankee Atomic makes clear that it is incumbent upon the plaintiff to separate those overhead costs that are caused by the breach when compiling a damage claim from other unrelated overheads. Parse out which overhead costs are related to the breach for the purpose of making a claim even where plaintiffs continue to allocate overhead costs to breach-related projects in the normal course of business. I'm reading you, perhaps wrongly, as saying only direct costs can be reimbursed under this contract breach. I don't think you don't read me or us correctly, Your Honor. Let me be perfectly clear about this. That's what I want you to do. The government does not contest that the plaintiffs have an opportunity to collect not only direct costs but also indirect costs. But what Carolina Power makes perfectly clear is that only the indirect costs that have a nexus to the underlying projects are recoverable. That's precisely what this court held in Carolina Power when it said that the materials loaders, that the costs that underlie the materials loaders were diverted toward breach-related projects. This court, the Southern California Edison Court, did not make such a finding. And if I may go to Mr. Fagg's example, if we go to 1040- Did you want the trial court in this case to go through the individual items at your request? Did you request he go through the individual items? Your Honor, we brought to the court's attention line item after line item of items that had nothing to do with the breach. If I can go to page 1044 of the appendix, there was a question about a saltwater cooling system, I believe it was called. And the question was, the saltwater cooling system is used to cool the reactor and then spend fuel pool, right? It's the ultimate heat sink for those, yes. But the saltwater cooling system isn't used for any purpose with respect to the ISPCA. Is it? Answer, no. Nonetheless, as Southern California Edison would have it, the government should pay 3%, 4%, 5%, whatever the allocation number is, to the cost of this. No case in this court, whether it be in the SNF context, whether it be in the cost accounting standard context, permits the recovery of overhead costs that have absolutely nothing to do with the underlying charge. Now, it is certainly a burden, and that's why they call it a burden of proof for the plaintiffs to establish damages. But if they want the government to pay for something like a fish impingement study, like this saltwater cooling system, they have to establish why it is that resources were diverted toward a breach-related project. If they can't do so, they have failed to sustain the burden of proof. Now, we certainly don't think that the plaintiffs, because they included tens of millions of dollars in these overhead pools that had nothing to do with the breach, we don't think they established or met their burden of proof at all in terms of proving damages with reasonable certainty. Nonetheless, we do think it's appropriate that, at a minimum, the case be remanded so that the plaintiffs be required and the court have an opportunity to evaluate which costs in the overhead pools, which costs out of the $25 million that they claim are related to the breach and which ones they don't. And to the extent that there's any million of dollars, $2 million, $5 million, $10 million, that's the plaintiff's burden to prove it. And if they can't prove it because it's inconvenient, that's their problem, not the government's. Okay, thank you. That helps. Thank you, Mr. Haberbach. Case will be taken under advisement. All rise.